# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  09CV01723

Paula Nelson, Plaintiff

V.

Jeffrey Skehan

Connie Trout

David G. Skehan

John Doe #1

Boulder County Drug Task Force

Lafayette Police Department

Lafayette Police Chief Paul Schultz

Detective Nathan Vasquez,

Lafayette Police Officer  James Johnson

Lafayette Police Sergeant Maschka

Lafayette Police Detective Gary Thatcher

Lafayette Police Officers John Does 3-8

Lafayette Police Officer Keith Chagnon

Lafayette Municipal Court

Roger Buchholz, Lafayette Municipal Judge

Ralph Josephson ,  Prosecutor  for the City of Lafayette

The City of Lafayette

Gary Klaphake, Administrator City of Lafayette

Chris Cameron, Mayor of the City of Lafayette

David Williamson, Attorney for the City of Lafayette

David Strungis,  Mayor Pro Tem City of Lafayette

Kerry Bensman , Council Member - City of Lafayette

Alex Schatz, Council Member - City of Lafayette

Frank Phillips, Council Member - City of Lafayette

Carolyn Cutler, Council Member - City of Lafayette

Jay Ruggeri, Council Member - City of Lafayette

---

# SECOND AMENDED COMPLAINT

## PARTIES

1.   Plaintiff   Paula Nelson  is  a citizen of  Colorado who presently resides at the following address:
      338 Chinook Avenue, Longmont, CO 80504

2.   Defendant Jeffrey Skehan,is a citizen of Colorado who lives at the following address:
      1016 Opal Street, Apartment 202, Broomfield, CO  80020

3.   Defendant Connie Trout,is a citizen of Colorado who lives at the following address:
      1670 South Cherryvale Road, Boulder, CO 80303

4.   David G. Skehan,is a citizen of Florida who lives  at the following address:
      1922 SE 40th Street, Cape Coral, FL.  33904-50440

5.   John Doe #1 is a vagrant that used to live in an abandoned camper on Finch Street in Lafayette.
      His current address is unknown.

6.    Sergeant Maschka, is an employee of the Lafayette Police Department
      which  is located at the following address:
      451 North 111th Street, Lafayette CO, 80026

7.    Boulder County Drug Task Force, is  division of  of the
      Boulder County Sheriff's Office -
      which  is located at the following address:
       1777 6th Street, Boulder, CO. 80302

8.    The Lafayette Police Department  is located at the following address:
      451 North 111th Street, Lafayette CO, 80026

9.    Lafayette Police Chief Paul Schultz is an employee of the
      Lafayette Police Department  which  is located at the following address:
      451 North 111th Street, Lafayette CO, 80026

10.   Detective Nathan Vasquez is an employee of the
      Lafayette Police Department  which  is located at the following address:
      451 North 111th Street, Lafayette CO, 80026

11.   Lafayette Police Officer James Johnson is an employee of the
      Lafayette Police Department  which  is located at the following address:
      451 North 111th Street, Lafayette CO, 8002610.

12.   Lafayette Police Sergeant Maschka  is an employee of the
      Lafayette Police Department  which  is located at the following address:
      451 North 111th Street, Lafayette CO, 80026

13.   Lafayette Police Detective Gary Thatcher  is an employee of the
      Lafayette Police Department  which  is located at the following address:
      451 North 111th Street, Lafayette CO, 80026

14. Lafayette Police Officers John Does 3-8 are unidentified officers of the Lafayette Police Department which is located at: 451 North 111th Street, Lafayette CO, 80026

15. Officer Keith Chagnon is an employee of the Lafayette Police Department which is located at the following address: 451 North 111th Street, Lafayette CO, 80026

16. The Lafayette Municipal Court is located at the following address: 451 North 111th Street, Lafayette CO, 80026

17. Lafayette Municipal Judge Roger Buchholz is an employee of the City of Lafayette. The court is located at the following address: 451 North 111th Street, Lafayette CO, 80026

18. City Prosecutor Ralph Josephson is an employee of the City of Lafayette which is located at the following address: 1290 South Public Road Lafayette, CO 80026

19. The City of Lafayette is located at the following address: 1290 South Public Road Lafayette, CO 80026

20. Gary Klaphake is the City Administrator for the city of Lafayette which is located at the following address: 1290 South Public Road Lafayette, CO 80026

21. Dave Williamson, City Attorney for the City of Lafayette which is located at the following address: 1290 South Public Road Lafayette, CO 80026

22.     Chris Cameron, Mayor of the City of Lafayette
        which is located at the following address:
        1290 South Public Road Lafayette, CO 80026

23.     David Strungis, Mayor Pro Tem for the City of Lafayette
        which is located at the following address:
        1290 South Public Road Lafayette, CO 80026

24.     Kerry Bensman, City Council Person for the City of Lafayette
        which is located at the following address:
        1290 South Public Road Lafayette, CO 80026

25.      Alex Schatz, City Council Person for the City of Lafayette
        which is located at the following address:
        1290 South Public Road Lafayette, CO 80026

26.     Frank Phillips, City Council Person for the City of Lafayette
        which is located at the following address:
        1290 South Public Road Lafayette, CO 80026

27.     Carolyn Cutler, City Council Person for the City of Lafayette
        which is located at the following address:
        1290 South Public Road Lafayette, CO 80026

28.     Jay Ruggeri, City Council Person for the City of Lafayette
        which is located at the following address:
        1290 South Public Road Lafayette, CO 80026

## Jurisdiction and Basic Statements of Fact

1) The Plaintiff states that the Defendants named herein did willfully act to deprive The Plaintiff of her rights under the Constitution of the United States.

2) The Plaintiff requests enforcement of these rights under 42 U.S.C. § 1983 and 1985(3). These deprivations of right occurred between July 2007 and November of 2008 in the City of Lafayette, Boulder County, Colorado.

3) The Plaintiff states that there was a conspiracy to deprive the Plaintiff of her right to property and right to due process which is actionable under 42 U.S.C. § 1985(3). The Plaintiff was deprived of her right to due process because she was a "poor person" as defined by Colorado Statute 13-16-103 and "mentally impaired" as defined by Colorado Statute 24-34-301.

4) Subject matter jurisdiction is granted under 28 U.S.C. § 1331.55

5) The Plaintiff requests supplemental jurisdiction over all pendant claims of state law and torts against her person under 28 U.S.C. § 1367,

6) The Plaintiff requests a trial by Jury

7) The deprivation of rights secured by the Constitution of the United States include, but are not limited to, the following:

    (a) Amendment I -Freedom of speech

    (b) Amendment IV - The right to be secure in her person and property.

    (c) Amendment VIII -Protection against cruel and unusual punishment.

    (d) Amendment XIV - Procedural due process

    (e) Amendment XIV -Equal protection under the law.

8) The Constitution of the State of Colorado Article II section  16a  defines the **Rights of crime victims** and states "  Any person who is a victim of a criminal act..... shall have the right to be heard when relevant, informed, and present at all critical stages of the criminal justice process."   The Plaintiff  was denied the right to be heard and the right to be informed.   The Plaintiff  was denied this right which was  a denial of equal protection of the law.

9) By availing themselves of the protection of the police to avoid prosecution for theft and receipt of stolen goods the Defendants Connie Trout, Jeffrey Skehan and David G. Skehan did become state actors under color of law.

10) The Plaintiff  believes that members of  the Boulder County Drug Task force and the   Lafayette Police force  had  prior  knowledge  of  the  theft  referred  to  in paragraph nine and  they are liable under  42 U.S.C. § 1986, action for neglect to prevent.   The information that led to this belief  was discovered on January 5, 2009.

11) The City of Lafayette is not entitled to immunity from liability  because:

    (a) The decisions that deprived the Plaintiff of federally protected right were a matter of policy and custom, reviewed by supervisors and administrators who were deliberately indifferent to the rights of the Plaintiff.

    (b) The intentional actions of employees of the City of Lafayette  enabled Jeffrey Skehan and Connie Trout to steal the Plaintiff's property without criminal penalty.  They also resulted in an abusive prosecution for a traffic offense in retribution for her protest to that theft.

(c)  The Plaintiff  maintains that a reasonable investigation into the charges of the Plaintiff against Skehan and Trout would have proven the theft and it was the sanctioning of that theft by the Lafayette Police that created the violations of Constitutional right.

(d)  The Plaintiff  maintains that the Police of the City of Lafayette are not properly trained and supervised and it is their established practice to investigate complaints in an arbitrary and unprofessional manner.

12) The policies of the City of Lafayette were the proximate cause of:

(a)  The loss of the Plaintiff's personal property with an estimated retail value in excess of $60,0000

(b)  Serious psychological and emotional harm which resulted in her hospi-talization shortly after the incident.

(c)  Additional psychological harm and a delay in her healing from the first trauma as a result of a traffic  incident on November 23, 2007 and a second failure to investigate.

(d)  Abuse of process, denial of access to public records, and denial of legal right to appeal based on her inability to afford a transcript of the trial of that traffic incident, which did result in yet another delay in healing from the trauma inflicted.

(e)  The loss of the Plaintiff's home of  twenty years to foreclosure due to her inability to work caused by the trauma.

(f)  Loss of income due to time spent trying to defend her rights in civil actions.

# **First Claim for Relief**

*Violation of  Constitutional Rights, Theft,  Fraud, Conspiracy to Commit Theft,
Assault, Battery, Extortion,Interstate Transportation of Stolen Goods*

(13)   Jeffrey Skehan, Connie Trout, and possibly John Doe #1, the vagrant known as "Alex",  stole personal and business property belongint to the Plaintiff from 104 East Simpson, her business premises,  and 109 East Cleveland, her home, which were located  Lafayette, Colorado.

(14)   The Plaintiff  estimates the retail value of this property to be in excess of $60,000.

(15)   The Plaintiff  believes that the theft occurred  during the last two weeks of June and the first week of July 2007, but there may have been earlier incidents.

(16)   Jeffrey Skehan was in a position of fiduciary trust.

(17)   Jeffrey Skehan introduced Connie Trout to the Plaintiff and said she was a trustworthy person.   The Plaintiff  relied on his assertion.  Connie Trout  was paid to help Jeffrey Skehan with the move of the business.

(18)   Jeffrey Skehan and Connie Trout  sold and attempted to sell property belonging to the Plaintiff during that time without her knowledge or consent.

(19)   Jeffrey Skehan did on several occasions state that John Doe #1,  a vagrant and an acquaintance of Jeffrey Skehan  was also stealing from the Plaintiff.

(20)   Jeffrey Skehan disposed of several items of business property that were designated as items to be retained, not sold.

(21)   The Plaintiff  believes he was selling property for cash or check at any price regardless of true value and pocketing the cash.

(22)    On the evening of July 2, 2007 the Plaintiff went from her home to the Simpson street location to find out how the move was going.   She found the front and back door unlocked an no one around.

(23)    An hour or two later Jeffrey Skehan and Connie Trout arrived.  Jeffrey Skehan was highly intoxicated.   Connie Trout appeared to be sober.   They claimed they just "took a break to play pool" at the neighborhood bar.

(24)    An  argument  ensued. Jeffrey  Skehan  became  angry  and  Connie  Trout encouraged that  anger.   She started demanding that the Plaintiff  pay Jeffrey Skehan  "what you owe him".   The Plaintiff  said she  owed him nothing.

(25)    Jeffrey Skehan and Connie Trout did then  physically  restrain, assault and batter the Plaintiff.

(26)    At that time, by means of criminal extortion,  the Plaintiff  was forced to  sign off on the title for the R.V. that she jointly owned with the Plaintiff Jeffrey Skehan. The Plaintiff 's name was put on the title just a few weeks earlier  so that she would invest approximately $2000 for tires, brakes and other  repairs.

(27)    While  the  Plaintiff  was  still  under  physical  restraint,   Trout  and  Skehan threatened to stop moving property from the business location to the Plaintiff's home unless she gave Jeffrey Skehan jewelry.

(28)    The business premises was being vacated due to foreclosure the next day.  The Plaintiff  feared this would have left tens of thousands of dollars worth of property to be thrown out on the street.

(29)    In order to gain physical release and escape the verbal abuse, the Plaintiff was forced to scrawl  a note (EXHIBIT 1) that said simply that Jeffrey Skehan could have everything she owned.    It was the Plaintiff's belief that this would not be an enforceable document.

(30)    Trout  witnessed this document and consented to the physical release of the Plaintiff.

(31)   The extorted paper was presented to the Lafayette Police on July 6, 2007.  It was represented as  a valid and binding contract which entitled Jeff Skehan and Connie Trout  to goods stolen prior to the writing of that paper and afterwards .

(32)   The Plaintiff  believes Jeffrey Skehan and Connie Trout had some  reason to believe that the police would honor this document.

(33)   Jeffrey Skehan, did not mention the incident during the following week.  There was no indication  that he took the document seriously or that he intended to enforce it.

(34)   On that Friday Jeffrey Skehan started to unload  the last of the boxes of merchandise from 104 East Simpson from  where they had been temporarily stored in the R.V..  He made no claim of ownership as he carried those boxes onto the Plaintiff's  property or into her house.

(35)   Shortly after the boxes were unloaded the Plaintiff  noted that one box had been rifled and merchandise was removed.   the Plaintiff had packed this box herself while Jeff and Connie  were "playing pool".   This box contained all of the most valuable items in the retail shop.

(36)   Jeffrey Skehan had previously expressed the fear that Connie Trout might steal if given the chance.  In response to that fear, he told the Plaintiff that he had taken her collection of antique 18 carat rings and other personal jewelry and hidden it in the attic of her home.

(37)   the Plaintiff stated that she believed Connie Trout had stolen a lot of jewelry and said she was going to call the police.

(38)   When officer James Johnson arrived,  the Plaintiff accused Connie Trout of Theft and Jeffrey Skehan made statements about items she was wearing without permission.  This is confirmed in the police narrative report  (Exhibit 5).

(39)   When the police confronted Connie Trout at her home it was she who brought up the extorted document and used it to defend herself against the accusation of theft.   Connie claimed the items she had were payment due her.

(40)   When the police told  Jeffrey Skehan what Connie had said he   produced the extorted document and changed his story.

(41)   Jeffrey Skehan  then took a position against the Plaintiff, as opposed to backing up her original complaint of theft against Connie Trout.

(42)   The Defendants Jeffrey Skehan and Connie Trout presented no written bill or claim of debt to the Plaintiff.  They made no declaration of debt to any court, swore no affidavit of ownership or debt,  and made no attempt to legally collect the debt they claimed.

(43)   Jeffrey Skehan and Connie Trout  accepted the protection of the Lafayette Police for their illegal acts and became actors under color of  state law in violation of the Plaintiff's  rights as defined in  42 U.S.C. § 1983.

(44)   In the next few days after the initial incident  the Plaintiff discovered several empty stock drawers  in the house.   When the Plaintiff had last inspected those drawers they were full of merchandise marked for retail and they were located  at the 104 East Simpson location.   This is when the Plaintiff first became aware that there was prior theft of large quantities of merchandise.

(45)   On or about July 7, 2007 Jeffrey Skehan left the state of Colorado with the stolen merchandise and delivered it to his father's place of residence in Cape Coral, Florida.

(46)   On August  10, 2007 Detective Gary Thatcher interviewed Jeffrey Skehan.  The
report  of  that interview stated  "Jeff said he was familiar with all her jewelry and
she did not have any such jewelry as she is describing as stolen."

(47)   On knowledge and belief the Plaintiff states that this was a reference to the
Plaintiff's personal collection of antique rings and other personal items of jewelry.
Those items were found months later when the Plaintiff was forced to move from
her home.    Jeffrey Skehan lied because he had hidden the items himself.   the
Plaintiff did not find them until months later.

## Second Claim for Relief

*Violation of  Constitutional Rights,Theft,  Fraud, Conspiracy to Commit Theft,
Interstate Transportation of Stolen Goods,  Receipt of Stolen Goods,
Slander, Outrageous Conduct*

(48)   The Plaintiff  states  that David G. Skehan is an accessory to the theft and
incorporates paragraphs 12-46 by reference.

(49)   On or about the twenty-eighth of June David G. Skehan was told by his son that
the Plaintiff's property was being taken to a location other than 109 East
Cleveland.  This was more than a week  before the Plaintiff became aware of the
ongoing theft.  David G. Skehan informed the Plaintiff of these events in a phone
conversation on July 6th or 7th.

(50)   David G. Skehan acted with intentional neglect designed to cause economic and
emotional harm to the Plaintiff.

(51)    David G. Skehan gave his son the money to flee the jurisdiction of Colorado with the Plaintiff's merchandise.

(52)    When Jeffrey Skehan arrived in Florida he moved in with his father and gave up physical possession of  some or all of the merchandise to him.

(53)    David G. Skehan sent pictures of  the stolen property to the Lafayette Police Department while it was in his possession.

(54)    David G. Skehan filed false a false affidavit with the Boulder County Court in order to evade jurisdiction in the Plaintiff's civil suit  08CV658  (Exhibit 11).

(55)    David Skehan states in this affidavit that his son sold gifted merchandise on his own, but that statement is contradicted in the Police report.

(56)    In  Detective Thatcher's report report, Exhibit 8, page 2,  Detective Thatcher states "I was contacted by David Skehan, Jeff,'s father" .  The Detective continues to recount the slander made against the Plaintiff.

(57)    In  David G. Skehan's  affidavit to the court (Exhibit 12, page 5)  David G. Skehan states: "Lafayette Detective Gary Thatcher called me in Florida to ask me questions about the Plaintiff.  I answered his questions in good faith and based upon information available to me.  I did not reach out to Detective Thatcher.  It would be unfair to be sued in Colorado because I answered questions when a Colorado police officer called me. "

(58)    Judge Balin relied on the truth of  David G. Skehan's affidavit in her decision to deny state jurisdiction over him.

(59)    David G. Skehan did commit perjury in order to deprive the Plaintiff of her Constitutional right.

(60)   In this conversation Detective Thatcher reported that David G. Skehan stated that "they" (Jeffrey andDavid G. Skehan) were going to sell the Plaintiff's merchandise  to pay his son's debts.

(61)   Detective Thatcher told the Plaintiff in a phone call that he had told David Skehan not to dispose of the merchandise without getting it appraised first.

(62)   The Plaintiff  states that she has seen the credit report of Jeffrey Skehan.  Jeffrey Skehan did not have debts equal to the amount of the merchandise except those alleged by David G. Skehan to be owed to him personally.

(63)   In September of 2007 and February of 2008 Jeffrey Skehan told the Plaintiff that his father had taken possession of the property in dispute and disposed of it .

(64)   David G. Skehan did commit slander per se by accusing  the Plaintiff  of intent to commit  the crime of insurance fraud, and committing  the crime of stalking.

(65)   David G. Skehan did intentionally minimize and misrepresent the value of the merchandise taken to Detective Thatcher in order to discredit the Plaintiff.

(66)   By protecting his son in his crime, giving him  funds to flee the jurisdiction of Colorado  and  transport   stolen  goods  across  state  lines  David  G.  Skehan became complicit in the crime of theft.

(67)   By helping Jeffrey Skehan dispose of the Plaintiff's property  and the actions in paragraph 65,  David G. Skehan violated federal law and state statues in both Colorado and Florida .

# Third Claim for Relief

*Illegal Civil Standby,  Violation of Constitutional Rights,*
*Deprivation of  Due Process*
*Exercise of Judicial  Powers beyond the Scope of Police Authority*

(68)   Officer Johnson exceeded the power of his office on July 6,2007 when  he declared the theft of the Plaintiff's property a civil matter by assuming the validity of contracts that did not exist but were only alleged by Connie Trout and Jeffrey Skehan.

(69)   The extorted document  that was shown to him was was such that no reasonable person could look upon it and  call it a binding contract.

(70)   Jeffrey Skehan offered no date, specific terms or witnesses to the alleged verbal contract.

(71)   Sergeant Maschka  made an administrative decision to back the conclusions of Officer Johnson when he called for a civil standby.

(72)   A civil standby for domestic reasons should have permitted Jeffrey Skehan to collect his clothing and personal possessions and leave.  He did not take his clothing with him.

(73)   The Lafayette Police that were standing by knew that it was the property of the Plaintiff that was being seized.  They knew that the property was being taken in payment of an alleged debt.

(74)   Jeffrey Skehan stated in a document submitted to the 20th Judicial District of Colorado that  one or more of those  officers who stood by on that date offered to enter the Plaintiff's  home when they were off duty and seize additional property.

(75)   During this civil standby the Plaintiff continued to confront the police and object to the removal of her property.   The Plaintiff  clearly stated that the paper Skehan and Trout presented had been  extorted  under physical and economic threat.

(76)   The Plaintiff    pointed out specific deficiencies in appearance and content that
       made it clear that the document  was not a valid contract.

(77)   The allegation of duress by the Plaintiff was sufficient to establish the incident as
       a possible theft under C.R.S.  18-4-401.

(78)   The complete dismissal of these allegations by Officer Johnson,  Sergeant
       Maschka, and the other officers involved in the "civl standby"  was  outrageous.

(79)   These actions violated the Plaintiff's right to be secure in her person and property
       and her right to due process and equal protection under the law.

(80)   Even if the debt had been legitimate, the standby was illegal and a violation of
       the Plaintiff's Constitutional right  to due process.  Paragraphs 5-8 incorporated
       by reference:

       Fuentes v. Shevin   407 U.S. 67

       If the right to notice and a hearing is to serve its full purpose, then, it is clear
       that it must be granted at a time when the deprivation can still be prevented.
       At a later hearing, an individual's possessions can be returned to him if they
       were unfairly or mistakenly taken in the first place. Damages may even be
       [p82] awarded to him for the wrongful deprivation. But no later hearing and
       no damage award can undo the fact that the arbitrary taking that was sub-
       ject to the right of procedural due process has already occurred. "This Court
       has not . . . embraced the general proposition that a wrong may be done if it
       can be undone." Stanley v. Illinois, 405 U.S. 645, 647.

       Barrett v. Harwood, 189 F.3d 297, 302 (2d Cir. 1999).

       The court stated that the "crucial question" was whether or not the officer
       was "taking an active role that either affirmatively assisted in the reposses-
       sion over the debtor's objection or intentionally intimidated the debtor so as
       to prevent him from exercising his legal right to object to the repossession."
       *Id.* at 302-03

# Fourth Claim for Relief

*Failure to Supervise, Employment of an Officer not Fit for Duty,*
*Deliberate Indifference*

(81)   The Plaintiff  called to file a complaint of theft against Connie Trout  on the morning of July 6, 2007.    Officer James Johnson responded.

(82)   During the time that Officer Johnson was supposed to be investigating the theft of the Plaintiff's property  on July 6, 2007  he did not appear to be fit for duty.  He was often  visibly struggling to maintain control, abusive, and unprofessional.

(83)   Officer Johnson's decision to enforce contracts that did not exist was outrageous, unreasonable and irrational.

(84)   Officer Johnson's decision to enforce contracts that did not exist was a violation of his oath of office.

(85)   Officer Johnson acted prejudicially against the rights of the Plaintiff  when he ignored the fact that  Jeffrey Skehan changed his story

(86)   At one point  Officer Johnson  confronted the Plaintiff with the extorted document and claimed that it proved the jewelry was Jeff's property and not the Plaintiff's.

(87)   When the Plaintiff  disagreed and pointed out that the document didn't even mention jewelry the situation between them escalated and Officer Johnson threatened her with arrest for saying he was wrong.

(88)   The above actions of Officer Johnson violated her right to free speech.

(89)   During  this  confrontation and at other times that day Officer Johnson showed signs of personal distress, suggesting that he had a history of familial abuse, mental illness, or drug abuse.   He was not able to respond professionally to the Plaintiff due to this impairment. (See exhibit 5 for Officer Johnson's account)

(90)   There are numerous errors in Officer Johnson's report dated July 12, 2007.  The Plaintiff  believes that his recorded verbal notes concerning the incident  will show additional errors and confusion on the part of Officer Johnson.

(91)   The date of the incident is stated as July 3, 2007 not July 6, 2007.

(92)   The address of the Plaintiff's home is  related as 109 East Chester four times and 108 East Chester once.  Chester is four blocks away from Cleveland Street and Five Blocks from the Plaintiff's business location on Simpson Street.   Lafayette only has twelve east-west streets in that neighborhood.   It is unlikely that an officer would make such a mistake unless he was impaired in some way.

(93)   This report also states that the missing jewelry was "gold fill bracelets".   The Plaintiff  does not carry gold filled bracelets.   He was shown gold filled and sterling neck chain of 18-30 inches in length.

(94)   Officer Johnson reports the length of Ms. Trout's employment as three days instead of three weeks as he was told by the Plaintiff and Jeffrey Skehan.

(95)   In his written report , Exhibit 5, Officer Johnson stated that  "this incident was found to be a civil matter based on written contracts and verbal agreements between all three parties involved."

(96)   The Plaintiff   consistently  and repeatedly denied the existence of any written or verbal contract that entitled Jeffrey Skehan to her personal property.

(97)   At the end of this report Officer Johnson  incorrectly identified the Plaintiff, Paula Nelson, as "Connie" .  Connie was never present at the Cleveland Street or Simpson location on that day.

(98)   Numerous statements are attributed to the Plaintiff that simply were not made.

(99)   It is  Officer Johnson's duty and part of his job to observe and report incidents accurately.

(100)  Officer Johnson's ability to perform his duty and his illegal decisions were not questioned by Sergeant Maschka when the civil standby was ordered.

(101)  Detective Gary Thatcher did not question his ability to perform or attempt to correct  the blatant errors of fact in his report.  He refused to investigate the incident  so they would not be exposed instead.

(102)  The impaired state and judgement of Officer Johnson was evident:

  (a)  on July 6 at the scene of the  incident

  (b)  on July 12 when he wrote his report

  (c)  in April after the Plaintiff's traffic trial.

(103)  The Plaintiff   questions whether Officer Johnson is fit for duty.

(104)  The Plaintiff  states that Officer Johnson's impairment has been willfully  ignored by the Police Chief Schultz and the  administration of the Police Department,

(105)  The impaired condition and judgement of Officer Johnson  was the proximate cause of the Plaintiff's loss of rights as described in paragraphs 6-8.

(106)  Officer Keith Chagnon also filed a false report incriminating the Plaintiff  in a traffic accident on November 23, 2007.   The Plaintiff  believes this was an act of revenge on behalf of Officer Johnson.

(107)  Officer Johnson was present  at the Plaintiff's traffic trial  in April of 2008.   There was no reason for him to be there except for a personal wish to observe the proceedings.

(108)  The Plaintiff  ran out of the courtroom in anguish and  was highly distraught  after that trial.    Officer Johnson approached her,  placed her in fear of arrest,  and exacerbated  the situation.

(109)  If Richard Sprung  had not  been there and  blocked him from coming closer and speaking to the Plaintiff  further, she would  have broken down completely.

(110)  The Plaintiff  believes this is what  Officer Johnson wanted and he would have used it as a pretext to arrest her.

## *Fifth Claim for Relief*

*Violation of  Constitutional Rights,  Failure to Investigate*

(111)  The Plaintiff  alleges that on two occasions the Police of the City of  Lafayette showed deliberate indifference to her Civil Rights and with intentional negligence failed to investigate.    Both of these incidents resulted in deprivation of rights under the Constitution of the  United Sates as stated in paragraphs 5-8 of this complaint.

(112)  The Plaintiff   called to file a complaint of theft against Connie Trout  on the morning of July 6, 2007 she had been living in the city of Lafayette and in the business selling the same sort of  goods at wholesale since 1988.

(113)  The complaint was made to Officer Johnson by the Plaintiff in the presence of Jeffrey Skehan.

(114)  Jeffrey  Skehan stated to officer Johnson that he found it odd that Ms. Trout brought an empty  duffle bag  to work with her and  stated that Trout  spoke at

length on her cell phone with someone  about the business affairs of the Plaintiff. This statement was recanted later that day but it did not occur to Officer Johnson to actually investigate or question the change in  Jeffrey Skehan's story.

(115)  Officer Johnson's report of July 12th (Exhibit 5)  records the changes in Jeffrey Skehan's statements   throughout  the  day  but  neither  Officer  Johnson  or Detective Thatcher investigated or question ed the legality of Jeffrey Skehan and Connie Trout's behavior.

(116)  The Plaintiff  has no criminal record whatsoever.

(117)  Jeffrey Skehan was on probation at the time and has a prior conviction for theft.

(118)   In Exhibit 6,  Detective Gary Thatcher states that he took an oral report from the Plaintiff.  He was clearly informed of the Plaintiff's multiple objections the the seizure of her property.

(119)  Detective Thatcher conferred with Officer Johnson on the twelfth of July  and did not request any clarification of the alleged  "verbal contract" or question Officer Johnson's conclusion that it was a civil incident.

(120)  In   Exhibit 7,  Detective Thatcher stated  "Jeff reviewed the photos that I printed of the jewelry he has in Florida.  Jeff again said that the jewelry he has was agreed upon and that he was owed $5,000.

(121)  Detective Thatcher did not address the issue that the Plaintiff had been in the jewelry business for almost twenty years and had given a dramatically higher estimate while Jeffrey Skehan had no demonstrable knowledge of the value of the property.

(122)   Exhibit 8 , shows that the Plaintiff was still hoping to convince the city to prosecute Jeffrey Skehan and Connie Trout for theft and recover her property.

(123)   The Plaintiff  had begun to organize her legal arguments against the Jeffrey Skehan, Connie Trout, David G. Skehan and the Police of the City of Lafayette in written form, this is the "argument" submitted to Detective Thatcher at this time. It is submitted to this court as Exhibit 9.

(124)   The Plaintiff  requested that this argument  be submitted to the Boulder District Attorney's Office, still believing that she might be heard as required by law.

(125)   Detective Thatcher refused to submit this argument to the District Attorney's Office.

(126)   The Plaintiff  gave Detective Thatcher  digital photos of  Connie Trout in her trailer which were taken by Jeff Skehan on June 28, 2007  (Exhibit 12).  Connie Trout was  wearing jewelry belonging to the Plaintiff and making comic faces over a heavy bag of material.

(127)   The Plaintiff  stated to him that the volume of the material in that bag would be equal to the contents of two locker drawers that held the necklace she was wearing and other merchandise the Plaintiff was processing for retail sale.

(128)   The date of these pictures is prior to the date of  the  "contract" extorted  on July second.

(129)   These photos disproved Jeffrey Skehan's claim that Connie had the necklaces because he "still owed her $180" (Exhibit 5) .  The photos were taken a week before "still owed" would have occurred and one day after the Plaintiff paid her $200  by check. (Exhibit 10).

(130) In response to the photos Detective Thatcher stated "I showed the bag to Officer Johnson, who informed me it was the same bag he received consent to search in, which contained no jewelry."

(131) The statement in paragraph above is absurd.   The photos presented  were taken on the 28th of June,  Officer Johnson searched her bag on the sixth of July.

(132) The Plaintiff believes this was an attempt to create an appearance of an investigation but no real investigation was made because it would have exposed the City to liability.

## Second Failure to Investigate

(133) Detective Thatcher states that the Boulder County District Attorney confirmed that it was a civil incident.  If the Boulder County District Attorney was given the correct information and complete reports on this incident they should have identified it as an illegal seizure and advised the Lafayette Police of that fact.

## Third Failure to Investigate

(134) On November 23, 2007 a bicyclist drove in front of the Plaintiff's car on the roadway.

(135) Officer Keith Chagnon responded to the call.   His "investigation" was limited to taking initial statements from the Plaintiff and the bicyclist.

(136) He made a presumption of guilt and re-interpreted both the Plaintiff's statement and the physical realities of the scene in order to state  that the accident happened on the sidewalk and not on the roadway as was the actual case.

(137) The Plaintiff protested and became greatly agitated.  She was threatened with arrest and Officer Chagnon refused to properly record her statement.

(138) Officer Chagnon filed a state accident report that falsely diagramed the scene and was inadequate according to statutory requirement.

(139)  By not investigating the accident  Officer Chagnon deprived the Plaintiff of equal protection under the law and exposed her to the risk of a lawsuit by the bicyclist.

## Sixth Claim for Relief

*Outrageous Conduct, Neglect to Prevent,*
*Conspiracy and  Interference with Civil Rights*

(140) On  January 4,2009  the Plaintiff discovered that there were additional events taking place at the same time  that the crimes of assault and theft were being committed against her person.

(141) Warrants were being executed by Detective Nathan  Vasquez  relating to Federal Case  07-cr-00403-MSK USA v. Caekaert et al.   These warrants were the culmination of an  intensive undercover  investigation by Detective Vasquez.

(142) 104 East Simpson was in the immediate neighborhood of this investigation.

(143) In the parking lot of  the building next to 104 East Simpson we frequently observed the same people unloading large loads of household goods.

(144)   Jeffrey  Skehan told the Plaintiff that these people were actually bringing in drugs from Mexico and the household goods were a cover.

(145)   The Plaintiff and Jeffrey Skehan filed a complaint with the police  against  "Alex" or John Doe #1 in November of 2006.

(146)   The behavior of  "Alex" at this time was cruel and abusive.  That is why  the Plaintiff   told the police she  did not  want him around her house or business.

(147)   There was definite animosity between Alex and the Plaintiff.

(148)   The account of this report released to the public stated that it concerned a "John Doe" of the age of 64.   The Plaintiff told the police  that he was about 20 years younger than that.

(149)   The Plaintiff believes this report was falsified in order to  obscure the true identity of "Alex" which was the under cover identity of Detective Nathan Vasquez.

(150)   "Alex"  kept showing up from time to time in spite of the fact that the Plaintiff and Jeffrey Skehan  had filed a complaint with the police.

(151)   On more than one occasion Jeffrey Skehan identified "Alex" as his source for Marijuana and  Methamphetamine.

(152)   Jeffrey Skehan at one point stated that "Alex"  had stolen the Plaintiff's tools. They were returned after the Plaintiff gave Jeff $20 to "buy them back".

(153)   Detective Nathan Vasquez had arrested Jeffrey Skehan in December  for giving him one prescription pain pill, an incident which occurred in September.

(154)    When the Plaintiff listened to the surveillance recording, this seemed to be an incident of entrapment, and not a legitimate arrest.

(155)  Jeffrey Skehan was put on probation for that offense.

(156)  Jeffery Skehan and the Plaintiff were alarmed when his probation was reassigned to the unit for serious and recent sexual offenders that summer. The probation officer to whom his case was reassigned rejected that assignment as inappropriate.

(157)  An indigent friend of Jeffrey Skehan's showed up at our door one evening.   We let him shower and gave him some of Jeff's clean clothes.   He said he had just gotten out of jail and he wanted to warn Jeff that the word was out that he was an informant and to be careful.

(158)  The Plaintiff believes that "Alex" or  John Doe #1 was actually  the undercover identity  of  Detective  Nathan  Vasquez.   Further,  the  Plaintiff  believes  that Detective Vasquez was aware of the crimes being committed against thePlaintiff as they were taking place and that he  protected his informants  during and after the commission of those crimes.

(159)  The Plaintiff  did not use illegal drugs or condone Jeffrey Skehan's use of  them.

(160)  The use of these drugs was a danger to the mental health of Jeffrey Skehan.

(161)  On knowledge and belief, the Plaintiff states that the defendant Jeffrey Skehan has been diagnosed  Severely  Mentally Impaired by a state facility in Payson, Arizona.

(162)   Amphetamine and Methamphetamine were used as medical treatments until the 1950's.  They were used as treatments for ADD and Depression.

(163)   Jeffrey Skehan has been diagnosed with both conditions.  His propensity to drug use is partially because of untreated psychiatric problems and the Plaintiff believes this may have been exploited by other conspirators.

(164)   The Plaintiff believes that Jeffrey Skehan infirmity was explooited and he  was forced into becoming an informant in the  investigation cited in item 139.

(165)   As an informant he would be under the  close observation of Detective  Nathan Vasquez  of the Boulder County Drug Task force and other members of the Lafayette Police force.

(166)   Jeffrey Skehan's statement in item 73 indicates some sort of ongoing relationship with the Lafayette Police that would cause them to side with him.

(167)   Jeffrey Skehan  and Connie Trout  appeared to believe  that they  would  get the support of the Lafayette Police Department in their scheme of theft and cover up

(168)   "Alex"  disappeared from the area right after these events.   The last time the Plaintiff  saw  "Alex"  was when he was leaving with Jeff in the R.V. on the July 6, 2007.

(169)   "Alex's"  illegal residence on Finch Street  was cleared from the property it had been on for several months shortly after the arrests in the Federal Drug case were made.

(170)   One Saturday soon after  the July 6tth  incident the Plaintiff was disturbed and wanted to talk to someone at the police  department about the theft case.    A 40-ish male of the same build and demeanor as "Alex" entered the building and went directly into the officer's area.   The Plaintiff was confused at the time but now believes this was "Alex" who was in fact Detective Nathan Vasquez.

(171)   Jeffrey Skehan was allowed to leave the state in violation of parole and sex offender statutes in an uninsured vehicle.

(172)   Connie Trout was also on probation and  had just had a "dirty" urinalysis just before we met.


## Seventh Claim for Relief

*Denial of Equal Protection Under the Law,  Denial of Due Process,*
*Abuse of Process*

(173)   In August of  2007 the Plaintiff was charged with Arson by the Lafayette Police for burning a pair of Jeffrey Skehan's jeans in the back yard of her home on a stone and sand patio.

(174)   When the Plaintiff went to arraignment on this charge the prosecuting attorney laughed, said she might have done the same, and dismissed the case.

(175)   The Plaintiff incorporates paragraphs 118-127 in reference to the false report and failure to investigate of Officer Keith Chagnon.

(176)   A bicyclist drove in front of the Plaintiff's car as she was entering a roadway on an unlighted bicycle.   The Plaintiff pled not guilty at arraignment and stated that she could not possibly yield the right of way to something she could not see.

(177)   The Judge said there must be a trial because there was a "question of fact". There was no question of fact because the Judge had just found the bicycle rider guilty of riding an unlighted bicycle seconds before.

(178)   The Plaintiff also told Judge  Buchholz that she did not believe she could adequately defend herself at trial because of her  neurological condition and the confusion it caused when she was under stress.

(179)   Judge Buchholz assured the Plaintiff that the trial would not be difficult and that she did not need an attorney.  He also  promised that the written argument she brought to the arraignment would be fairly considered at trial.  It was  not.

(180)   The trial that ensued was a total violation of due process and civil right.

(181)   The Prosecuting Attorney should have dropped the case because there was no way he could prove *mens rea* or *actus reus.* He did not have a prima facie case.

(182)   The trial include many violations of the Plaintiff's rights and violations of   Judicial ethics and practice.  These violations included but were not limited to:

(a)   coaching and correcting a witness by the prosecution

(b)   taunting the defendant

(c)   the judge telling the defendant she could hear when she could not

(d)   accepting  hearsay  testimony  from  Officer  Chagnon  about  the location of the accident when he specifically testified that he did not ask about or investigate this disputed fact.

(183)   The Judge attested to personal knowledge of the scene of the accident but refused  to  take  notice  of  those  physical  peculiarities  which  made  the prosecution's version of the events impossible.

(184)   The Plaintiff's  testimony conformed to the physical facts of the case.

(185)   Colorado Revised Statutes 42 -4-1708 (3)  states  "the  burden of proof shall be upon the people, and the traffic magistrate shall enter judgment in favor of the Defendant unless  the  people  prove  the liability  of  the  Defendant beyond a reasonable doubt" .   The ruling of  Judge Buchholz  was in violation of this statute and denied the Plaintiff equal treatment under the law.

(186)   During the trial  Ms. Nelson's  mental state deteriorated to the point  that she was inconsolable  and  distraught  by  the  end  of  the  proceedings.   This extreme reaction  was a  neurological reaction to stress which is the result of physical injury to the brain.  It was not under  voluntary control.

(187)   The court was notified of this condition at the arraignment.  the Plaintiff believes that this condition was deliberately exacerbated and that this amounted to cruel and unusual punishment.

(188)   It was then that she was confronted by officer Johnson.  Paragraphs 91-94 are incorporated by reference.

(189)   The following week the Plaintiff went to the Lafayette Municipal Court  to examine the record of the trial and  consider an appeal.   She was refused  access to the public record.

(190)   Instead she was given a copy of a Municipal Order (Exhibit 2) and it was stated that she would have to pay the listed cost bond in order to appeal.

(191)   When the Plaintiff pled indigency she was denied.

(192)    Two district judges granted her request to file without costs shortly afterward.

(193)  Judge Buchholz apparently applied a standard other than that which is mandated by Colorado CJD 98-01.

(194)  The Plaintiff was denied access to the record of her arraignment and trial from April to November of 2008.

(195)  The Plaintiff made multiple demands to see the record during that time, both orally and in writing.

(196)  The Plaintiff attempted to complete the record on appeal in an alternate fashion but was not successful.

(197)  The Prosecutor  Ralph Josephson made filings concerning the appeal that were in bad faith according to C.R.C.P.  Rule 11.

(198)  Access to the record was only given after the Plaintiff  made an instant demand for access in writing.

(199)  The Plaintiff's demand was presented to the District Clerk.

(200)  This demand  stated that the Plaintiff's rights were being violated by the Lafayette Court and asked that it be  presented  to a judge immediately.

(201)  When the Plaintiff went  to the Municipal Court that same day she was given access to the record of her arraignment and appeal.

(202)  The  Plaintiff  then submitted a REQUEST FOR RECONSIDERATION to the Municipal Court.

(203)  This request cited multiple reversible errors and   irregularities and in the proceedings.   It was denied without comment.

(204)  The Plaintiff feels that it was timely filed because she could not file it without access to the record.

(205)   C.A.R. 10(b) states that the appellant can order a partial Record on Appeal. Denial of access to the record blocked that avenue of appeal.   The Municipal Order demanding  a transcript deposit far above what may be required blocks that avenue  of appeal for all citizens who would appeal a decision of that court.

(206)   The Plaintiff believes that Judge Buchholz was acting as an administrator and not in a judicial capacity when he created the illegal order that prevented the Plaintiff from appealing her case.

(207)   The Plaintiff believes Judge Buchholz's objective in that order was to maximize revenue for the city and make it difficult or impossible to appeal his decisions.


# Eighth  Claim for Relief
### Failure to Supervise,  Deliberate Indifference to the Rights of the Plaintiff


(208)   In mid October 2008 the Plaintiff phoned the Lafayette City government and asked for the city administrator.   The phone call was taken by his female assistant.

(209)   The Plaintiff  informed her of the unconstitutional nature of the Municipal Ordinance of Judge Buchholz , the withholding of public records, the unfair nature of the Plaintiff's trial, and the obstruction of the Plaintiff's appeal.  the Plaintiff was told he would get back to her.  The call was not returned.

(210)  On October 26,2008   the Plaintiff   sent an email to all administrative city employees listed  listed on the city web site and to all city council members. (Exhibit 3.)

(211)  This email  clearly advised them of the activities of the court that the Plaintiff believed to be  illegal.   She  informed them that Judge Roger Buchholz was administering the court in violation of Federal and State Constitutional right , state statute, and directives of the Chief Justice.

(212)  These parties included Gary Klaphake, Chris Cameron, David Williamson, David Strungis, Kerry Bensman,  Alex Schatz, Frank Phillips, Carolyn Cutler, and Jay Ruggeri,

(213)  This plea for oversight  was ignored.

(214)  The City of Lafayette did not  properly supervise the Municipal Court  and refused to protect the rights of the Plaintiff when asked to do so.    This did further establish a pattern and practice of denying the Civil Rights of the Plaintiff in violation of  42 U.S.C. § 1983.

## DEMAND FOR RELIEF

The Plaintiff had no experience with law enforcement other than minor traffic tickets or parking tickets before this event.   This deprivation of rights was traumatic and caused serious economic and emotional injury.

Ms. Nelson seeks an award,  jointly and severally,   of triple damages for civil theft and compensatory and putative damages for tortious actions  as provided for in both Colorado and Florida Statute against Jeffrey Skehan, Connie Trout, David G. Skehan.

Ms. Nelson requests an order to the Municipal Court of the City of Lafayette to vacate their illegal judgement against her and rescind the Municipal Ordinance that would deny citizens an opportunity to appeal the decisions of the court.

Additionally the Plaintiff requests the following judgements against the City of Lafayette:

a) Injunctive and remedial relief to correct the injustice done by the court and the police and ensure the safety and well being of the Plaintiff  and others who might be exposed to these unjust patterns and practices  of the City of Lafayette and its police.

b) Compensatory damages for losses, damages and injuries described
in this complaint, including but not limited to loss of income, pain,
suffering and emotional distress.

c) Punitive and exemplary damages against the individual Defendants
who condoned and perpetuated these policies on  the relevant federal
and state claims in the amount to be determined at trial.

d) Interest, both pre-and post-judgement as allowed by law.

e) Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and

f)  Such  further as the Court deems just and proper.

Paula Nelson,  appearing pro se
338 Chinook Avenue
Longmont, CO 80501

720-334-2468

Paula@colorado-online.biz

Date:_____

## S/ Paula Nelson

_____

(Plaintiff's Original Signature)

# Appendix A
## List of Exhibits:

1) Extorted Document , Undated, Witnessed by Connie Trout

2) Municipal Court Order re: Appeals

3) E-mail and List of Attachments,  Sent to City of Lafayette Administrators

4) Incident Report, Lafayette P.D.  original dated 07/06/2007

5) Incident Report, Lafayette P.D.  Supp. #2  dated 07/12/2007

6) Incident Report, Lafayette P.D.  Supp. #3 dated  07/13/2007

7) Incident Report, Lafayette P.D.  Supp. #4 dated  08/01/2007

8) Incident Report, Lafayette P.D.  Supp. #5 dated  08/17/2007

9) Argument Presented by The Plaintiff - undated

10) Checks in Payment for Services to Connie Trout

11) David G. Skehan's Reply to Civil Suit with False Affidavit.

12) Pictures of Connie Trout wearing stolen property on 06/28/2007.