Detective Thatcher -  Argument –

1) Jeffrey Skehan was a partner in a real estate venture and a future jewelry venture
2) Jeffrey Skehan was a partner in the planned enterprise of retail jewelry sales from the motor home that he was remodeling with the plaintiff.
3) Jeffrey Skehan was a domestic partner and if the partnership continued long term it was agreed that marriage and business partnership would be considered.
4) Jeffrey Skehan was not a partner in the retail or wholesale jewelry businesses.
5) Jeffrey Skehan attempted to obtain title to goods under threat of economic harm, namely refusal to move business property owned by Paula Nelson at a crucial time.
6) Jeffrey Skehan did take from my possession a collection of antique rings, some of which I've had for almost 30 years.
7) Jeffrey Skehan did economic and personal harm to Paula Nelson by the seizure of business and personal property.  He did also dispose of a motor vehicle that was jointly owned without the knowledge and consent of Paula Nelson
8) Jeffrey Skehan did the above with malice and forethought.  Settlement of the civil issues does not waive any rights to criminal prosecution on the part of Paula Nelson.

Officer Johnson made a legal determination as to the ownership of the property removed from 104 E. Simpson.  This was beyond the scope of his office.

Since the written contract makes no mention of exchange of goods for services it is void.

Since Mr. Skehan has never asked Ms. Nelson for remuneration for specific services or a specific dollar value of those services, there is no oral contract in place.  Note:  Officer Johnson did not cite any specifics, only generalities in his report.   There was no discussion of the dollar value of the goods exchanged nor a chance for physical inventory in order to ascertain that dollar value.

It is agreed that Ms. Nelson intended to split any amount obtained over and above the amout of foreclosure or received for a quit claim on 104 East Simpson.  Until the Friday preceeding, both Ms. Nelson and Mr. Skehan expected that there would be proceeds from this sale.   There were none.   Ms. Nelson went into a state of nervous collapse because the buyer who had agreed to take the property failed in his financing.  Mr. Skehan was in a manic state and had begun abusing alcohol in an attempt to self medicate.   Mr. Skehan began to operate in his traditional familial role as victim and blamed Ms. Nelson for this failure.  This gave him the self-justification necessary to defraud Ms. Nelson of her personal property which lay beyond the scope of their agreement.

Mr. Skehan is a lifelong victim of physical and psychological abuse.   Ms. Nelson has documented hypoxic brain damage.   Neither was capable of entering into a business arrangement at the time officer Johnson made his legal determination.

Jeffrey Skehan was a partner in the attempt to clean up and sell the real estate at 104 East Simpson for a profit in lieu of foreclosure, but not in the jewelry business.   The Plaintiff had agreed to share the proceeds of the real estate with him and that was our principal business endeavor together.   The plaintiff asked Mr. Skehan's father, David Skehan to further the success of this partnership by loaning or guaranteeing  the amount necessary to keep the property from foreclosure, his father refused.  The plaintiff permitted Jeffrey Skehan to make decisions on what to repair and how to do it with my full knowledge and permission.  Notably, he repaired the foundation and painted the house in spite of the fact that the plaintiff pointed out that there might not be any compensation for that effort if the property was not sold for over the foreclosure amount.

The Colorado Uniform Partnership Act 7-64-202-3(a) states that:

> **7-64-203.**
> **(**3)  In determining whether a partnership is formed, the following rules apply:
>
> (a)  Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property.
>
> **7-64-203.  Partnership property.** Property acquired by a partnership is property of the partnership and not of the partners individually.
>
> **7-64-204.  When property is partnership property.** (1)  Property is partnership property if acquired in the name of:
>
> (a)  The partnership; or
>
> (b)  One or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership but without an indication of the name of the partnership.
>
> (2)  Property is acquired in the name of the partnership by a transfer to:
>
> (a)  The partnership in its name; or
>
> (b)  One or more partners in their capacity as partners in the partnership, if the name of the partnership is indicated in the instrument transferring title to the property.
>
> (3)  Property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.
>
> (4)  Property acquired in the name of one or more of the partners, without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership and without use of partnership assets is presumed to be separate property, even if used for partnership purposes.

The property in question does not meet the test of partnership property.  It was acquired prior to my even knowing Jeffrey Skehan.
2) Jeffrey Skehan was a partner in the future venture of retail sales from the R.V.   We jointly contributed to that venture.   He contributed the R.V.  and the Plaintiff contributed money for maintenance, repair and remodeling that exceeded his initial purchase price. Mr. Skehan agreed that the R.V. should be joint property and it was so titled.   The plaintiff paid for the title, insurance, and all operational costs.   It was agreed that profits from that venture would be shared.  The Plaintiff agreed to provide inventory but it was made clear that the plaintiff expected to be cost of that inventory be deducted  before profit was recorded.

Mr. Skehan originally represented that he would take the improvements in the R.V. as compensation.  The plaintiff did revoke permission to sell the motor vehicle when Mr. Skehan seized compensation under duress in an amount that was egregiously in excess of the compensation earned.  Jeffrey Skehan did dispose of said motor vehicle without the knowledge and consent of the plaintiff in spite of the fact that his father was that he no lon-

ger held a valid title.   His father was the only available means of communicating with Mr. Skehan that the plaintiff had.   Mr. Skehan was in regular touch with his father and seemed to be taking advice from him on business matters.   David G. Skehan was advised that a a duplicate title had been obtained and that it voided all previous titles.

Jeff Skehan did not retaining the plates and turn them over to Ms. Nelson.    As of August 6th the vehicle was still registered in her name and poses a liability to her.   The plaintiff requests that Mr.  Skehan be required to produce those plates or to give Ms. Nelson a copy of the bill of sale and full information on the purchaser of the vehicle so that she may do so.  The plaintiff further  requests that the greater of 50%  proceeds of said sale minus  or the the value of the repairs be tendered as proper dissolution of the partnership.   If  Mr. Skehan is unable to restore all property wrongfully taken from the plaintiff it is requested that the court grant complete ownership of the vehicle to the plaintiff.

  **7-64-405.  Actions by partnership and partners.** (1)  A partnership may maintain an action against a partner for a breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership.

  (2)  A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

  (a)  Enforce the partner's rights under the partnership agreement;

  (b)  Enforce the partner's rights under this article, including:

  (I)  The partner's rights under section 7-64-401, 7-64-403, or 7-64-404;

  (II)  The partner's right on dissociation to have the partner's interest in the partnership purchased pursuant to section 7-64-701 or enforce any other right under part 6 or part 7 of this article; or

  (III)  The partner's right to compel a dissolution and winding up of the partnership business under section 7-64-801 or enforce any other right under part 8 of this article; or

  (c)  Enforce the rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship.

  (3)  The accrual of, and any time limitation on, a right of action for a remedy under this section is governed by other law.  A right to an accounting upon a dissolution and winding up does not revive a claim barred by law.


3) Jeffrey Skehan was a domestic partner of the plaintiff.   There was no common law marriage or agreement to marry in the future.   Participation in domestic chores was freely given by both parties.   The plaintiff  routinely participated in such chores as cooking and laundry and  in addition the plaintiff did legal research for the pro se divorce proceedings or Mr. Skehan.

Mr. Skehan remained unemployed during the entire period of cohabitation so the plaintiff  purchased clothing for him and gifts for his daughter, paid for all food, alcoholic beverages, cigarettes, mortgages, and utilities, in addition to child support, court costs, and court fines which would normally be the sole responsibility of Mr. Skehan.   It is believed on at least one occasion her funds were used to obtain illegal drugs.  In return he performed domestic chores such as home repair and helping with cleaning.  On occasion he watched the plaintiff's jewelry business so that she might shop for groceries, cook, or do laundry.

4) Jeffrey Skehan presumed a partnership in the jewelry business where none existed.   the plaintiff  had no knowledge of the fact that Mr. Skehan was attempting to dispose of business property by selling it to Stone Face Smoke Shop in Lafayette.   Further, Mr. Skehan did represent to the plaintiff on August 3, 2007 that all of her personal and business property had been disposed of.

Mr. Skehan did not not keep a record of any items sold or monies received as required by the state or the IRS. It is the plaintiff's intent to issue an IRS form 1099 at year's end for the fair market value of all missing merchandise as disclosed when the inventory is audited.

When acting as an employee Mr. Skehan did not act in good faith. Notably, he accepted checks for goods on July 2. 2007 without recording the items sold and was unable or unwilling to tell the plaintiff specifically which items were sold and for what amount so the sales could be properly recorded.

On or about July 2, 2007 Mr. Skehan did also dispose of business property that was specifically designated by the plaintiff as property to be retained, he sold property for less than the price designated by the plaitiff, and sold other business property. All cash monies for said transactions were retained by him and he refused or was unable to make specific accounting for said monies.

Jeffrey Skehan had no authority to make a contract of any sort except for the sale of goods on behalf of the Cassandra Collection at marked prices or a pre-determined discount rate on selected merchandise and to negotiate day labor on behalf of the plaintiff when moving her wholesale and retail operation. To the knowledge of the plaintiff Mr. Skehan he did not make any contract whatsoever on behalf of the wholesale business Strung-Out-And-Stoned Gems other than day labor.

Constance Trout alleges that Mr. Skehan made a barter contract with her concerning day labor in lieu of payment. The plaintiff maintains that Mr. Skehan had funds from the sale of business property with which to compensate Ms. Trout and that such a barter contract was not authorized. In fact, when questioned about the jewelry Ms. Trout was wearing on July 2, 2007, Ms. Trout stated that she was wearing it because she found it and she didn't want it to get lost. Mr. Skehan made a substantially identical statement to officer Johnson on the morning of July 6th. He later recanted this statement and said he gave the jewelry to hold because Ms. Nelson was unable to pay Ms. Trout. The plaintiff maintains that since Ms. Trout was paid in full on 06/21/2007 for the sum of $120, and again on 06/27/07 for the sum of $200.00 and did not ask her or make a demand for additional payment that there was no reason that she should not expect to be paid. Further, Mr. Skehan had sufficient cash from the sale of business property to pay her in full and in cash. Instead of paying her he bought liquor (empty bottles were found on the porch after he left on the 6th) and paid for Ms. Trout and himself to play pool and drink at the bar. He admitted to being at the bar for two hours on the evening of July 2nd when I thought he was packing the business.

On the Morning of July 6th Mr. Skehan stated to officer Johnson that he found it odd that Ms. Trout brought an empty duffle bag to work with her and that she was talking to an unknown person for an hour or two about the business affairs of the plaintiff. He also recanted this statement later that day. It is the intent of the plaintiff to subpoena the phone records of Ms. Trout and depose her.

The plaintiff maintains that Mr. Skehan was not the partner in any enterprise involving the sale of jewelry or stones. If Mr. Skehan maintains that he was a partner, then he should be already aware that there were no profits from the retail enterprise, the Cassandra Collection, to share. If Jeffrey Skehan insists on participation in that venture he must accept responsibility for its losses and the plaintiff will oblige by giving him a full accounting of those losses no later than June 1, 2008.

5) The plaintiff maintains that the actions of Jeffrey Skehan caused her great economic and emotional harm resulting ultimately in her inpatient treatment at Centennial Peaks Psychiatric hospital. The plaintiff has been treated intermittently for depression in the past but has not needed psychiatric care, hospitalization, or ongoing counseling and drug therapy until after this incident.

On the evening of August 2, 2007 Jeffrey Skehan did accost the plaintiff when she was in a state of emotional collapse due to foreclosure on the business property at 104 East Simpson. He threatened her with economic

harm, namely refusing to move business property to her home, unless she gave him title to certain goods.   In a fit of grief the plaintiff did make and sign a contract giving him "every fucking thing I fucking own" in order to stop the verbal and emotional harassment he was subjecting her to.

Mr. Skehan's  demand for fair settlement that evening was unreasonable due to the emotional state of the plaintiff.   He did not present the plaintiff with any accounting of hours, tasks performed, or credit for  contributions to date.   There were no written agreements or prior verbal agreements concerning the value of the above other than a mutually co-operative domestic partnership that might possibly result in marriage or a business partnership after "a couple of years" and creation of a new and successful enterprise together.

The plaintiff did recover from this assault  and was able to begin research on an appeal to the plaintiff's parenting hearing for later that week.   After staying up most of the night working on this project on the morning of the 6th the plaintiff requested that the merchandise from the store be brought from the R. V. into her home.   Mr. Skehan was agreeable and did so promptly.

When the plaintiff found that a large quantity  of sterling and gold fill chain along with the display boards they were mounted on were missing Mr. Skehan agreed with her decision to call the police.   Officer Johnson arrived and Mr. Skehan, the plaintiff, and officer Johnson and  spoke frankly of suspicious activity on the part of Ms. Trout for quite a while.   Officer Johnson went to discuss the theft with Ms. Trout,  Mr. Skehan went to move furniture out of the office for sale, and I left to go grocery shopping because he complained about being hungry.

On returning from the store the Plaintiff was confronted by Officer Johnson and threatened with the charge of "false reporting".   Ms. Trout had claimed that the plaintiff  had actually given all of the retail merchandise to Mr. Skehan and that she only took what he said she could have.   Officer Johnson had a copy of the "contract" but Jeffrey only claimed what he said was just compensation.  Officer Johnson gave him permission to remove the merchandise.   I protested because I knew the dollar amount of what he was taking was very high,  he had badgered me into signing off on the R.V. and had previously accepted that as compensation,   he made no mention of wanting to leave or be compensated until after Officer Johnson decided that the "contract" was valid,  and I had no opportunity to negotiate, inventory, or value the personal property that was being removed.

Officer Johnson's report of the incident is incomplete and his memory of the incident is incorrect.   Several times he said that he responded to 109 East Chester and that my home was at 108 East Chester when in fact it was 109 East Cleveland.   Further, I did not stock nor never stocked gold fill bracelets.  I told the officer that a substantial quantity of gold fill and sterling chain worth NO LESS THAN $2000 was missing along with other items of substantial worth.

Connie Trout did not move the jewelry with the assistance of Jeff Skehan.   Jeff Skehan moved the jewelry with the assistance of Connie Trout.   When the officer asked how we (not I, but Jeff and I) knew Ms. Trout he was told that Jeff knew her from last year when he was living at the same trailer park.   We met her at King Soopers recently and Jeff hired her to assist in the physical labor of painting my bedroom and moving the business.  My asthma made it impossible for me to be much help.   The time of the employment was approximately three weeks, not three days.

Jeff corroborated my claim that Ms. Trout was supposedly wearing the jewelry just to keep it from getting lost.   The claim of the jewelry as security for employment was not made until after the officers came back from talking to Ms. Trout.  It was my understanding that Jeff was paying Ms. Trout with cash monies received from the sale of the business property and office furniture (excluding jewelry).

The next day I found that several drawers that I had packed full of sterling rings and earrings were empty.   These drawers measured 5"x 18" x 18"   I estimate the value of these items to be a minimum of $10,000.   This

merchandise was removed prior to the signing of the "contract" as the drawers were in the house at least a week before I discovered they were empty.

6) Previous to the signing of the alleged contract Jeffrey Skehan did seize personal property belonging to the plaintiff, namely a collection of antique 18K white gold and 14K yellow gold rings with precious and semi-precious stones and other jewelry estimated to be worth no less than $8,000 and as much as $12,000.

Previous to this event Jeffrey Skehan did attempt to sell business inventory belonging to Strung-Out-And-Stoned Gems (a sole proprietorship) and without her knowledge to_____
(smoke shop, Teresa).

Subsequent to the signing of the alleged contract Jeffrey Skehan admitted to the possession of all power tools and a hand truck belonging to Paula Nelson. the estimated value of this property is $500.    Jeffrey Skehan also admits to the possession of business inventory seized subsequent to the alleged contract.  the second admission is witnessed to by Detective Gary Thatcher of the Lafayette Police Department.   the estimated worth of this property is no less than $7,000.

the plaintiff maintains that Mr. Skehan also took possession of or knows who took possession of business inventory worth no less than an additional $5,000 prior to this event.  An upper limit on those losses can not be placed at this time without a full audit of inventory.  Because Jeffrey Skehan removed property from the business without establishing the value of the property The Plaintiff ask that he be responsible for all costs arriving from the inventory and audit of said inventory.  the estimated cost of performing this inventory and audit is _____.

Jeffrey Skehan had no knowledge of the jewelry trade when he met the plaintiff.  was not capable of making any significant contribution to the jewelry businesses without a long term investment in time and training by both parties. the plaintiff did estimate the length of this mutual contribution to be two years.  the plaintiff did hold out to Mr. Skehan that if this investment was made by both parties and the subsequent ventures were successful that he would be given him a full partnership in both the retail and wholesale businesses.  the unequal contribution of inventory at this time would be freely given out of love and affection and in recognition that he had a minor child to support and the plaintiff had no such obligation.

In the day to day operation of the retail business, the Cassandra Collection, Mr. Skehan was not permitted to sell any piece of jewelry at other than the marked price or specific classes of jewelry at one half of the marked price without the plaintiff's approval of the negotiated price.  His actions in that venture were that of an employee and he was more than adequately compensated by the terms of our domestic partnership.  During the time of the domestic partnership Mr. Skehan was encouraged to seek employment but did so on a very limited basis.  When offered employment he did not attend or was immediately discharged.

 the law of estoppel only applied to the real estate venture and the future enterprise, for which effort was made and remuneration was rightly expected.   Efforts in current the jewelry ventures were limited to watching the store while the plaintiff participated in domestic activity (making food or doing laundry).  the physical moving of the enterprise for which Mr. Skehan was due compensation, and several (less than five) days in which less than four hours was devoted to the learning of the jewelry trade, was also adequately compensated for by the domestic partnership agreement.

During the time of the relocation the plaintiff compensated one or more additional persons at all times because Mr. Skehan said he could not perform the work alone.   the value of his compensation for that activity (interest in the motor vehicle, room and board, and legal research for his pro se divorce and parenting actions) was substantially greater than the compensation of those persons.

Concerning the jewelry partnership, the plaintiff had no knowledge of the fact that Jeffrey Skehan was attempting to dispose of business property by selling it to the Smoke Shop or any other business. Jeffrey Skehan did dispose of business property without performing the fiduciary duties of a partner according to 7-60-121. He did not keep a record of any items sold or monies received. Notably the checks deposited on July 2, 2007 in the amount of $450 were accepted without recording the items sold. When asked, Mr. Skehan was unable or unwilling to tell the plaintiff specifically which items were sold and for what amount so they could be properly recorded. He did dispose of business property that was specifically designated as property to be retained and all monies for said transactions were retained by him without accounting.


8) the total losses to Paula Nelson in properties seized by Jeffrey Skehan and inventory necessitated by this seizure are no less than _____ ($18,000).

Jeffrey Skehan did seize personal property belonging to the plaintiff, namely all power tools in my possession and a collection of antique 18K white gold and 14K yellow gold rings estimated to be worth no less than 6,500 dollars and as much as 12,000 dollars.

Jeffrey Skehan admits to the possession of business inventory estimated to be worth no less than 7,000 dollars. The Plaintiff maintain that he also took possession or knows who took possession of business inventory worth no less than an additional 5,000 dollars.

the plaintiff further requests that the court declare all business partnerships between Paula Nelson and Jeffrey Skehan be declared null and void.